Filed 1/20/22  In re Victoria L. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re VICTORIA L. et al., Persons Coming Under the Juvenile Court Law. | B309966 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 18CCJP07998E-H) |
| Plaintiff and Respondent, | |
| v. | |
| ALEXIS M. | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Philip L. Soto, Judge.  Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

————————————————

The sole issue on appeal is whether the juvenile court erred when it assumed jurisdiction over Victoria L. and her siblings and removed them from their mother, appellant Alexis M. (Mother), a longtime victim of domestic violence. We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   The Petition

On September 18, 2020, Los Angeles County Department of Children and Family Services (DCFS) filed a petition as to 13-year-old Victoria L., 12-year-old C.L., and four-year-old twins. Two days earlier, DCFS had obtained a warrant of removal and placed the children with their maternal great-grandmother. The petition alleged Father and Mother had a long history of engaging in domestic violence with the latest incident occurring on August 20, 2020 when Father grabbed Mother's face, threw her to the floor, mounted her, pinned and strangled her, and repeatedly struck her head to the floor. Mother sustained a hematoma to the back of her head. Father then instructed Victoria to "watch" Mother and notify him if she attempted to leave the home. Father was arrested that day for spousal assault with false imprisonment.

 The petition also alleged that in November 2019, Mother struck Father in the face with her fist, causing his face to bleed. Victoria witnessed multiple prior occasions where Mother and Father engaged in physical altercations in her presence. Mother also failed to enforce an active criminal protective order against Father and allowed Father to reside in the home with unlimited access to the children. Mother and Father violated a February 6, 2020 juvenile court custody order permitting only monitored

2

visitation by Father. The petition alleged Father's violent conduct and Mother's failure to protect the children from him violated Welfare and Institutions Code[1] section 300, subdivision (a) (serious physical harm), endangering their physical health and safety and placing the children at risk of serious physical harm, damage, and danger.

The petition alleged a second violation of subdivision (a) when on September 15, 2020, Father engaged in a physical altercation with his female companion, Samantha Rodriguez. Rodriguez was struck in the lip by Father's fist and sustained a laceration, swelling and bleeding. It was alleged this altercation placed the children at risk of serious physical harm, damage and danger.

Based on the same multiple occasions of domestic violence between Father and Mother and the September 15, 2020 altercation between Father and Rodriguez, the petition also alleged violation of section 300, subdivision (b)(1) (failure to protect).

Finally, the petition alleged Father has a history of substance abuse including methamphetamine, amphetamine, and marijuana, which rendered him incapable of providing regular care and supervision of the children. On prior occasions, Father possessed, used and was under the influence of marijuana in the presence of the children. Mother knew of the substance abuse and failed to protect the children in that she allowed Father to reside in the home with unlimited access to the children. Father's substance abuse and Mother's failure to protect the children endangered their physical health and safety

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

and placed them at risk of serious physical harm and damage. The same facts were alleged in support of a violation of section 300, subdivision (j) (abuse of sibling).

B.    The Detention Report

On September 18, 2020, DCFS filed a Detention Report. Preliminarily DCFS advised the court that a prior petition based on the parents' domestic violence had been sustained on December 13, 2018.  On November 2, 2018, Father had choked Mother into unconsciousness and then prevented her from calling law enforcement.  Father was arrested yet Mother allowed him to return and reside in the family home with unlimited access to the children.  Father's substance abuse had also been alleged as a separate count.

The most current incident of domestic violence on August 20, 2020, resulted from an argument about "relationship issues." Mother was on the sofa when Father physically assaulted her. The children were in the home at the time.  The Fire Department responded to the home and treated Mother, who refused to be transported for further medical treatment.  Father was arrested. Mother was not offered an emergency protective order because she already had a restraining order against Father.

In the course of DCFS's investigation, Father stated he and Mother had split up three months before the August 20, 2020 incident.  The two older children were living with him and Mother had the twins with her.  He accused Mother of being a drug abuser and a conniving cheater who liked to be with other men.  He denied physically injuring Mother.  ~(1CT 22)~  He also stated Mother would disappear and abandon the children for months on end.

4

Father's probation officer was interviewed.  He reported Mother called him numerous times about Father's physical abuse; he told her there was nothing he could do unless she contacted the police, which she was reluctant to do.  Despite the restraining order, the parents were living together.

Initially, Mother did not want to speak to the investigating social workers about the August 20, 2020 incident because she did not want her statements "misconstrued."  For the most part the children denied witnessing any physical altercations between their parents (one of the twins stated Father choked Mother) and they said they felt safe with each parent.  After hearing that the children denied witnessing any domestic violence, Mother told the social worker she felt the children were being coached by Father's parents.  She said Victoria witnessed the August 20, 2020 incident and Mother pledged to support the investigation.  By August 26, 2020, Mother had left the home with the children and was staying in a hotel.  She then moved to a domestic violence shelter when she learned Father had been released on bail.

By September 4, 2020, Mother had enrolled in individual therapy, signed up for parenting classes, and requested legal services.  The children were receiving services from the shelter as well.  Mother was reported to be interactive and communicating well with the shelter.

As for the physical altercation between Father and his girlfriend Samantha Rodriguez, Rodriguez advised that when she went to Father's house to console him, he demanded sex in a very angry way and punched her in the lower lip with his fist when she did not acquiesce.  She locked herself in a bathroom and

called a cousin who called 911.  When the police arrived, she was shaking and crying and appeared to them to be very scared.

The Detention Report described Mother as "struggling with continued incidents of domestic violence with father.  Mother has been cooperative and continues to communicate with the Department in regards to the children's wellbeing.  Mother is resourceful and sought protection from father by residing in a shelter."  The Detention Report also stated that Mother had lost her job because Father had been harassing her at her workplace.  It also noted both parents had family who had reached out to DCFS to provide assistance as needed.  Each parent accused the other of manipulating the children. DCFS had concerns that the children were being coached not to disclose domestic violence in the home.

The Detention Report recounted five prior referrals for physical assaults on Mother by Father and one prior sustained petition based on Father's domestic violence and substance abuse and Mother's failure to protect the children.  The prior case was terminated on February 6, 2020 with an order granting full legal and physical custody to Mother and monitored visitation for Father.   As noted above, Mother did not enforce the order.

At the detention hearing on September 23, 2020, Father entered a general denial of the allegations.  The children were ordered detained at the home of a relative under the supervision of DCFS.  Monitored visitation was granted to both parents.  The children were placed at the home of their maternal great-grandmother.

C.    Jurisdiction and Disposition

On October 28, 2020, the juvenile court conducted the adjudication hearing.  Received into evidence were the detention report, the October 19, 2020 jurisdiction/disposition report, and several documents verifying Mother's residence, drug testing, and participation in services.

The jurisdiction/disposition report summarized the information in the Detention Report and recounted new interviews with the children.  Victoria recalled seeing her mother being injured by her father and having to care for her " 'because he was choking her.  If I didn't do it, he could have killed her.' " She witnessed numerous arguments between her parents.  She stated she would lock herself in her room so as not to "face reality."  She marveled at how she believed her father when he told her it was all Mother's fault and it was normal for him to hit Mother.  She said, " 'I'm changed now.  I don't want to go back to that.' "  She and C.L. would go to the park for hours to escape the hostile home environment.  Victoria said Father hit Mother " 'almost every single day.' "

C.L. told the social worker he liked living with his great-grandmother and worried about " 'dad finding us.  He's not doing good right now.  But I know the shelter would protect us.' "  He saw Father hitting, choking, and punching Mother.  He saw Father strangle Mother and heard her head hit the floor.  C.L. disclosed that he, too, had been physically abused by Father when Mother was not around to be hit.  He stated that he wanted to live with Mother " 'until my dad gets better.  He needs to show change.' "

Both twins acknowledged seeing their father hit their mother.  Both said Mother told them not to say anything about

what they saw. One twin reenacted the punching and slapping she had witnessed; she said she wanted to live by herself or with her mother. The other twin wanted to live with both parents where " 'Mom and dad don't hit each other.' "

Mother described sexual abuse, forced drug use, physical assaults, being scared of dying at the hand of Father, and being watched and threatened with death. Father would thwart her attempts to physically escape him and take away her electronic devices. He stalked her at work, resulting in termination of her employment of seven and one-half years. Mother disclosed she knew of Father's drug abuse. She also acknowledged observing red marks on C.L.'s checks which he said were a result of falling off his skateboard. She had also noticed that C.L. " 'would not sleep.' " Yet she did nothing. Mother cried when told that C.L. said Father had physically abused him when she was absent from the home.

The children were linked to mental health services and were scheduled to begin mental health sessions. Mother was receiving domestic violence education; financial literacy, parenting, and mandatory life skills classes; individual case management; and individual therapy.

DCFS pointedly noted that although Mother "appears to have an adequate perception of the children's need to be safe" she "has repeatedly shown insight to DCFS, yet repeatedly returned to father while hiding her relationship with father." In assessing Mother, DCFS concluded: "As mother had full custody of the children prior to the case, mother's lack of protective capacity is in full view." It was noted that DCFS and law enforcement repeatedly intervened from 2017 to 2020 in an effort to protect Mother and the children by giving her resources and services

while the criminal justice system incarcerated Father from January 2019 to June 2019.  Mother repeatedly told DCFS she did not want to rekindle her relationship with Father, all the while secretly getting together with him and ultimately permitting him to reside with the family by December 2019.

DCFS recommended removal of the children from Mother: "Due to mother's history of deceiving DCFS, coaching the children to deceive DCFS (evidenced by the twins saying mother would not let them disclose abuse), repeatedly returning to father through at least three years of abuse, knowing father used methamphetamine and still allowing father unlimited access to herself and the children, disregarding CPO and Family Law order[s] [without] taking responsibility of her actions, DCFS does not believe the children are safe with mother at this time.  Mother displays a history of poor judgment that places the children in danger.  [¶] . . . [¶]  When asked how domestic violence impacted the children, mother said there was no impact and they were stronger and more mature due to what they went through."  DCFS noted that since the children had been detained from their parents, Victoria had improved in school and no longer struggled with anxiety attacks and eating disorders, C.L. was now " 'goofy' and funny, and 'more himself' " and the children "feel safe other than having fear of father manipulating their thoughts and emotions once again."  DCFS also noted Father had taken no responsibility for any of his actions and continued to deny any violence toward Mother, his girlfriend, or his children.

At the hearing on October 28, 2020, the juvenile court sustained the petition and ordered the children removed from both parents.  In doing so, the juvenile court addressed Mother: "Let me put it to you this way, Mom, to say that this is a tough

9

case is an understatement. There's no two ways about it. There's nobody in the room who can say you're not trying. Okay? We give you credit for trying to fix this situation." "[T]here's no reasonable means to keep them safe without removal. And here's why—and I understand that Mom is doing her best. But this is not a one-time occurrence. We know from the papers. We know from our training, Mom is suffering from a condition that is called the battered women's syndrome. All of the telltale signs are present. She's going back to the same abuser. She's not breaking it off. She's minimizing the abuse. She's coaching the children to not say what happens. The children are intervening in order to protect her. [¶] She has to learn that this is a disease in [and] of itself, a disease, a mental condition of itself. And it can be trained out of a person. . . . It's a process. It doesn't happen overnight. It doesn't happen just because somebody is being protected in a shelter." "I have to look at what's in the best interest of the kids. Is it best for them to go back now or would it be better for them to let you learn these lessons fully and demonstrate your ability to adhere to these lessons before the kids are going back? [¶] And in that regard, what [counsel] said about your history . . . is what I'm making my decision on. Maybe if this was the first time, I would feel differently. In fact, I know, I would feel differently. . . . [¶] But first, in your case, because of this entrenched battered women's syndrome and the way it's affecting the kids, we need to know that you've gone through the process to retrain yourself not to go back to the father. . . . All I am saying is that I have to go slow. I have to know that the children will be protected. [¶] . . . [¶] So we'll give you what services are needed for you to complete the programming and allow for you to get your kids back if you complete it successfully

10

and you have broken it off with father.  The point is, you can't
have the abuser and your kid.  We are going to try and get him
services. . . .  But he's got a lot of issues.  And you've got to choose
between having him and his issues or having your kids.  You
can't have both.  That's very clear.  And I think you have realized
that.  But that is what is going to have to happen.  If you want
the kids back, you will have to break it off from the father.  [¶]
We'll give you both services to get the children back."

The juvenile court ordered the children placed with
relatives; permitted monitored and separate visitation for both
parents; ordered the parents to comply with the criminal
protective order; and mandated completion of five random on
demand drug tests, a domestic violence program for victims and
individual counseling for Mother.

Mother's appeal followed.

### DISCUSSION

A.    Jurisdiction

Mother argues the juvenile court erred in assuming
jurisdiction over her four children because they were never at
substantial risk of physical harm.  She contends Father directed
his blows at her only, so they were never endangered.  And
because the children did not present with past or present
injuries, Mother argues they were not at substantial risk of
future serious injury.  In the same vein, she appears to contend
that because they were never at risk, she did not fail to protect
them.

11

Jurisdictional findings are reviewed for substantial evidence and they will be affirmed where there is reasonable, credible evidence of solid value to support them. (*In re Jonathan B.* (2015) 235 Cal.App.4th 115, 119.) Section 300, subdivisions (a), (b) and (j) require only a substantial risk that a child will suffer serious physical harm or illness as a result of the failure or inability of the parent to adequately supervise or protect the child. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) When a child is at risk, the juvenile court may take jurisdiction before the child has suffered any actual harm. (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1002-1003.) When domestic violence is occurring within the home, children are "put in a position of physical danger from this violence, since, for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object by a fist arm, foot, or leg, or by [a victim] falling against them." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194, overruled on other grounds in *In re R.T.* (2017) 3 Cal.5th 622, 628.)

We do not reweigh the evidence or exercise independent judgment but review the evidence in the light most favorable to the court's determinations. Issues of fact and credibility are the province of the trial court. (*In re Heather A., supra,* 52 Cal.App.4th at p. 193.)

The severe domestic violence occurring in Mother's home undoubtedly put the children at substantial risk of future physical harm. All four children witnessed the violence between their parents and worried about their mother's safety. Victoria stated she physically tried to pull Father off Mother when he was choking her. Father actually involved Victoria in the violence he perpetrated on Mother, having her "watch" Mother in case she

12

tried to escape. This dynamic put Victoria squarely in the crosshairs of the violence as it was occurring.

Similarly, C.L. testified that when Mother briefly moved out of the home, Father physically abused him in her absence. Indeed, that C.L. became the next victim of his father's physical violence when Mother briefly left the residence portended a grim future of a risk of substantial violence for these children as they grew older and dared to cross their Father.

Even if we ignored the intentional physical abuse C.L. suffered because it was not formally alleged in the petition, we do not accept Mother's position that evidence of actual physical injury from domestic violence must be adduced to invoke section 300, subdivision (a). Case law has rejected this argument. (*In re Nathan E.* (2021) 61 Cal.App.5th 114, 120–121 [section 300, subdivision (a) includes domestic violence because a child is at substantial risk of suffering serious physical harm inflicted nonaccidentally by the parent]; *In re Giovanni F.* (2010) 184 Cal.App.4th 595, 598–599 [where child is present for incident of domestic violence, the ongoing risk of violence between the parents places the minor at risk of serious harm].) That all four children could recall witnessing numerous occasions of Father injuring Mother by punching, straddling, and slapping her is sufficient to place them at serious risk of substantial harm in the future.

Likewise, there is no evidence Mother ever tried to shield her children from Father's violence towards her. And she blithely accepted C.L.'s innocuous explanations for his facial injuries, knowing that she had trained her children never to discuss the violence occurring regularly in their household. That she endured this violence with no insight as to what it could subject

13

her children to physically supports the finding of failure to protect under section 300 subdivision (b).  The juvenile court rightfully assumed jurisdiction over the minors based on their parents' domestic violence and Mother's failure to protect them from this toxic and physically dangerous parental relationship.

B.      Removal

Mother also contends the juvenile court should not have removed the children from her custody and control.  Instead she argues the court should have permitted them to remain with her as she had ended her abusive relationship with their father.

On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that we must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by the clear and convincing evidence standard of proof.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005; *In re Ashly F.* (2014) 225 Cal.App.4th 803, 809.)  Children may not be removed from the home in which they are residing at the time of the petition unless there is clear and convincing evidence of a substantial danger to the child's physical health, safety protection or physical or emotional well-being and there are no reasonable means by which the child can be protected without removal.  (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288.)

Substantial evidence supports the court's finding under the clear and convincing standard that the children could not be safely returned to Mother's home.  By the time of the removal hearing, only eight weeks has passed since the children had been detained from their parents.  In those eight weeks, Father had

14

gone into custody on pending criminal charges arising from his altercation with Mother and Mother had begun residing at a domestic violence shelter. These eight weeks followed one prior dependency proceeding in the previous year where Mother claimed to have left Father while lying about allowing him to reside with the family in violation of a protective order. It also followed a 17-year relationship filled with many years of domestic violence and numerous DCFS referrals. That the juvenile court did not actively endorse returning the children to Mother's custody after only eight weeks of shelter assistance is certainly supported by the evidence of her prior and recent failures to follow through on similar promises to protect her children from the domestic violence in their home. The juvenile court's remarks at the hearing display a profound understanding of the dynamics of domestic violence and how recovery from Battered Women's Syndrome takes time. Rather than castigating Mother for her previous deceit and trickery, the juvenile court displayed compassionate support for her plight and offered all the resources it could muster on her behalf.

Yet the juvenile court also balanced its empathy for Mother with a rightful focus on the best interests of the minors, particularly their physical and emotional security. Given Mother's prior, recent history of returning to Father and then lying about it, eight weeks was too soon to confidently rely upon her representations. Indeed, Father was in custody at the time of the removal hearing. Whether, upon his release, she would succumb, as she had in the past, to pressure to rekindle their toxic relationship was untested. The juvenile court prudently concluded that it was too soon to rely on Mother's initial promising but brief recovery efforts and that she would have to

prove by her future conduct that she was ready to put her children's emotional and physical safety first and guard against future acquiescence in their father's violence. This was not a situation where simply adding more services or more monitoring could justify placing the children with Mother after only eight weeks. As the record bears out, Mother had previously been offered similar services and she still placed the children at risk. At this point it was and is all up to Mother to decide to turn things around. Effectuating such a decision would take time.

## DISPOSITION

The orders are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, J.

We concur:

GRIMES, Acting P. J.

WILEY, J.

16